# UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

|  |  |
|---|---|
| MINNESOTA AUTOMOBILE DEALERS ASSOCIATION, MINNESOTA TRUCKING ASSOCIATION, ALLIANCE OF AUTOMOBILE MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE, and AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, | Civil No. 15-2045 (JRT/KMM) |

Plaintiffs,

v.

JOHN LINC STINE, DAVE FREDERICKSON, MICHAEL ROTHMAN, and JULIE QUINN,

Defendants,

and

NATIONAL BIODIESEL BOARD, MINNESOTA SOYBEAN GROWERS ASSOCIATION, MINNESOTA BIODIESEL COUNCIL, and IOWA BIODIESEL BOARD,

Defendant-Intervenors.

### MEMORANDUM OPINION AND ORDER

---

Daniel R. Olson, Mark R. Bradford, Stanford P. Hill, and Steven M. Sitek, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, and Melissa A. Romanzo and Nash E. Long, **HUNTON & WILLIAMS LLP**, 101 South Tyron Street, Suite 3500, Charlotte, NC 28280, and William L. Wehrum, **HUNTON & WILLIAMS LLP**, 2200 Pennsylvania Avenue N.W., Washington, D.C. 20037, for plaintiffs.

Karen D. Olson, Deputy Attorney General, and Ann E. Cohen, Assistant Attorney General, **MINNESOTA ATTORNEY GENERAL'S OFFICE**, 445 Minnesota Street, Suite 900, St. Paul, MN 55101, for defendants.

Anupama D. Sreekanth and Richard D. Snyder, **FREDRICKSON & BYRON, PA**, 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, and Bryan M. Killian, **MORGAN, LEWIS & BOCKIUS, LLP**, 2020 K Street N.W., Washington D.C. 20006, for defendant-intervenors.

This case is a dispute over a state law, called the Minnesota Mandate, which requires diesel fuel sold to consumers in Minnesota to contain a specific percentage of biodiesel. Currently, the required biodiesel blend is ten percent ("B10"), but the statute calls for an increase to twenty percent ("B20") as early as 2018. Plaintiffs are oil, gas, trucking, auto manufacturer, and auto dealership trade associations. Defendants are Minnesota state officers who are connected to the implementation or enforcement of the Minnesota Mandate. Various biodiesel interest groups have also intervened on the side of the state officers. Plaintiffs challenge the Minnesota Mandate on two grounds: they argue that it is preempted by the Renewable Fuel Standard ("RFS"), a provision within the Clean Air Act, and that it was implemented in violation of Minnesota's Administrative Procedure Act ("MAPA"). Plaintiffs seek declaratory and injunctive relief with respect to both the present B10 mandate as well as the future increase to B20.

All parties have now filed dispositive motions. Plaintiffs have moved for partial summary judgment, and Defendants and Defendant-Intervenors have separately moved for judgment on the pleadings. Because Plaintiffs lack standing for their preemption claims against the Commissioner Defendants and also because the Minnesota Mandate does not frustrate the means that Congress chose to implement the RFS or otherwise pose an obstacle to the accomplishment of congressional objectives, the Court will grant Defendants' and Defendant-Intervenors' motions for judgment on the pleading for

Plaintiffs' preemption claims.  The Court will also grant judgment on the pleadings with respect to Plaintiffs' MAPA claims, because they are barred by the Eleventh Amendment. Finally, the Court will deny Plaintiffs' motion for partial summary judgment.

**BACKGROUND**

## I.   PARTIES

### A.   Plaintiffs

#### 1.   Minnesota Trucking Association

Minnesota Trucking Association ("MTA") is a non-profit trade organization that represents Minnesota's trucking industry.  (Compl., Ex. 1 ("Hausladen Decl.") ¶ 2, Apr. 17, 2015, Docket No. 1.)  MTA was established in 1932 and currently has over 690 members.  (*Id.*)  MTA is an "advocate for the trucking industry on a variety of public policy issues" and has individual members, including Kottke Trucking, that "operate diesel-powered vehicles in Minnesota." (*Id.* ¶¶ 2-5.)

#### 2.   Minnesota Automobile Dealers Association

Minnesota Automobile Dealers Association ("MADA") is a non-profit "voluntary membership organization" that represents "all 367 franchised new car and truck dealers in Minnesota."  (Compl., Ex. 3 ("Lambert Decl.") ¶ 1.)  MADA was established in 1927 and "advocates the political, legal, and regulatory interests of its members." (*Id.*)  "Many MADA members sell diesel-fuel vehicles" in Minnesota.  (*Id.* ¶ 7.)

### 3.    Alliance of Automobile Manufacturers

Alliance of Automobile Manufacturers ("Alliance") is a non-profit trade association that represents twelve different automobile manufacturers, comprising approximately "77% of all car and light truck sales in the United States." (Compl., Ex. 5 ("Ughetta Decl.") ¶¶ 2-3.) Alliance advocates "the general commercial, professional, legislative, regulatory and other common interests of its members," and represents its members "in legal proceedings." (*Id.* ¶ 3.) Individual Alliance members "have sold and continue to sell diesel-powered vehicles into the Minnesota market or may do so in the near future." (*Id.* ¶ 4.)

### 4.    American Petroleum Institute

American Petroleum Institute ("API") "is a national trade association representing over 625 companies involved in all aspects of America's oil and natural gas industry." (Compl., Ex. 6 ("Greco Decl.") ¶ 1.) API members include oil and natural gas "producers, refiners, blenders, pipeline operators and marine transporters, as well as service and supply companies that support all segments of the industry." (*Id.*) API advocates on behalf of its members "to the public, Congress and the Executive Branch, state governments and the media" and "represents the industry in legal proceedings." (Compl. ¶ 19.) Many individual API members sell diesel fuel in Minnesota. (*See* Greco Decl. ¶¶ 7-8.)

### 5.      American Fuel & Petrochemical Manufacturers

American Fuel & Petrochemical Manufacturers ("AFPM") "is a non-profit national trade association representing more than 400 companies, including a majority of all United States refiners and petrochemical manufacturers. AFPM members operate 120 U.S. refineries comprising more than 95% of U.S. refining capacity." (Compl., Ex. 7 ("Hogan Decl.") ¶ 1.)  "Individual members of AFPM sell diesel in Minnesota." (*Id.* ¶ 7.)

### B.      Defendants

Defendants in this case are four Minnesota state officers who are being sued in their official capacities.   (Compl. ¶¶ 23-26.)   Defendant John Linc Stine is the Commissioner of the Minnesota Pollution Control Agency. (*Id.* ¶ 23.) Defendant Dave Frederickson is the Commissioner of the Minnesota Department of Agriculture. (*Id.* ¶ 23.) Defendant Michael Rothman is the Commissioner of the Minnesota Department of Commerce.   (*Id.* ¶ 23.)   Defendant Julie Quinn is the Director of the Minnesota Department of Commerce's Weights and Measures Division. (*Id.* ¶ 23.)   Stine, Frederickson, and Rothman will be referred to collectively herein as the "Commissioner Defendants."  Quinn will be referred to as the "Director Defendant."  All four Defendants will be referred to collectively herein as the "State Defendants."

### C.      Defendant-Intervenors

Four trade associations connected to the biodiesel industry have intervened as Defendants:   National Biodiesel Board, Minnesota Soybean Growers Association,

Minnesota Biodiesel Council, and Iowa Biodiesel Board.  (Stipulation for Intervention, Aug. 12, 2015, Docket No. 40.)

## II.     FACTUAL AND LEGISLATIVE BACKGROUND

### A.     The Minnesota Mandate

Biodiesel is a clean-energy alternative to petroleum-based diesel fuel.  In 2002, the Minnesota legislature passed a law, called the Minnesota Mandate, requiring that each gallon of petroleum-based diesel fuel sold within the state contain two percent biodiesel ("B2").  2002 Minn. Laws. ch. 244.  The law applies to fuel retailers, such as gas stations. *See* Minn. Stat. § 239.77, subd. 2(a).  Minnesota was the first state in the nation to pass a biodiesel blending law, but other states have subsequently followed suit.  *See, e.g.*, Wash. Rev. Code § 19.112.110; 73 Pa. Stat. Cons. Stat. § 1650.3.  The Minnesota Mandate went into effect on September 29, 2005.  Minn. Stat. § 239.77, subd. 2(a)(1).

In 2008, the Minnesota legislature amended the Minnesota Mandate to increase the required biodiesel blend from two percent (B2), to five percent (B5), to ten percent (B10), and eventually to twenty percent (B20).  2008 Minn. Laws. ch. 297, § 51.  The B5 requirement became effective automatically on May 1, 2009, and the statute set target dates of May 1, 2012, for the move to B10 and May 1, 2018, for the move to B20. Minn. Stat. § 239.77, subd. 2(a)-(b).  Under the statute, the transitions to B10 and B20 were and are expressly contingent on the Commissioner Defendants making four specific factual findings regarding the state's readiness for the "next scheduled minimum content level." *Id.* § 239.77, subd. 2(b).

In November 2011, the Commissioner Defendants notified the state legislature that the transition to B10 would be delayed past the May 1, 2012, target date because they could not yet make all four required factual findings.  (Aff. of Ann E. Cohen, Ex. 1 at 1-2, Nov. 12, 2015, Docket No. 61.)  In July 2013, however, the Commissioner Defendants made the required factual findings, and the B10 mandate became effective as of July 1, 2014.  (Decl. of Nash E. Long, Ex. 2 at 13, Nov. 9, 2015, Docket No. 48.)   The B20 requirement is still on track to become effective on the original target date of May 1, 2018.

The Minnesota Mandate is enforced by the Director Defendant.  *See* Minn. Stat. §§ 239.01, 239.75.  If a fuel retailer sells diesel fuel not meeting the B10 blend requirement, the Director Defendant may, among other things, "issue a citation" or "request that a city or county attorney draft a misdemeanor complaint."  *Id.* § 239.75, subd. 2(4)-(5).  The maximum penalty for a violation is a misdemeanor.  *Id.* § 239.80, subd. 2.

### B.    Renewable Fuel Standard

In 2005, three years after Minnesota passed the first version of the Minnesota Mandate, Congress enacted the Renewable Fuel Standard ("RFS").  Energy Policy Act of 2005, Pub. L. No. 109-58, 119 Stat. 594.  Congress later amended the RFS in 2007.  Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492.  The current version of the RFS requires fuel "refineries, blenders, and importers" to sell or "introduce[] into commerce in the United States" each year an aggregate minimum volume of "biomass-based diesel."  42 U.S.C. § 7545(o)(2)(A)(i).  The statute empowers

EPA to set the yearly minimum volume requirements, *id.* § 7545(o)(2)(B)(ii), and also directs EPA to implement a credit trading program to ensure that this minimum volume requirement is met, *id.* § 7545(o)(5)(A). Congress, however, imposed two limitations on EPA's regulations. First, EPA cannot "restrict geographic areas in which [biomass-based diesel] may be used." *Id.* § 7545(o)(2)(A)(iii)(II)(aa). Second, EPA cannot "impose" on individual refineries, blenders, or importers "any per-gallon obligation for the use of [biomass-based diesel]." *Id.* § 7545(o)(2)(A)(iii)(II)(bb).

Pursuant to the statute, EPA has promulgated regulations implementing the RFS and the credit program. The credit program applies to "any refiner that produces gasoline or diesel fuel . . . or any importer that imports gasoline or diesel fuel" – these parties are called "obligated parties." 40 C.F.R. § 80.1406(a)(1). Each year, EPA designates a renewable volume obligation ("RVO") of biomass-based diesel that each obligated party must import or produce. *Id.* § 80.1407(a)(2). An obligated party, however, need not actually import or produce that amount; instead, obligated parties show compliance with their RVO by acquiring Renewable Identification Numbers ("RINs"). A RIN is generated whenever an obligated party produces or imports biomass-based diesel. *Id.* § 80.1426(a). After generation, RINs are "assigned" to a volume of biomass-based diesel and then "separated." *Id.* §§ 80.1428(a), 80.1429(a), (b). Separation occurs when an obligated party produces or acquires biomass-based diesel, or upon the blending of a gallon of biomass-based diesel to which a RIN is assigned. *Id.* § 80.1429(b). Obligated parties then use separated RINs to show EPA that they have met their yearly RVO. *See* 42 U.S.C. § 7545(o)(5)(B). If an obligated party acquires or accumulates RINs in excess

of its yearly RVO, it may sell its extra RINs in the marketplace to other obligated parties. *Id.* Conversely, if an obligated party does not meet its yearly RVO, it must, subject to limited exceptions, enter the marketplace and purchase RINs to make up the difference. *Id.*

## III.   PROCEDURAL HISTORY

Plaintiffs commenced this action on April 17, 2015.  In Count One of their complaint, Plaintiffs seek a declaratory judgment that the Minnesota Mandate conflicts with the RFS and is preempted pursuant to the Supremacy Clause, Article VI of the U.S. Constitution.[1]  (Compl. ¶¶ 43-58.)  In Count Two, which is an alternative claim, Plaintiffs seek a declaratory judgment that the Commissioner Defendants violated MAPA by making factual findings that triggered the B10 mandate without adhering to certain administrative rulemaking requirements.  (*Id.* ¶¶ 59-70.)  In Count Three, Plaintiffs seek a permanent injunction to prevent the Director Defendant from enforcing the B10 requirement, on the grounds that the RFS preempts the Minnesota Mandate and the Commissioner Defendants violated MAPA.  (*Id.* ¶¶ 71-82.)  Plaintiffs additionally seek a permanent injunction to prevent the State Defendants from implementing and enforcing the B20 mandate because it is preempted by the RFS, or alternatively, to prevent the

---

[1] Plaintiffs originally brought both express preemption and conflict preemption claims. During briefing for the present motions, however, Plaintiffs stipulated to the dismissal of their express preemption claim.  (Pls.' Response to Defs.' and Def.-Intervenors' Mots. For J. on the Pleadings at 13 n.2, Nov. 30, 2015, Docket No. 71.)  Accordingly, the Court will dismiss that claim, and will only consider Plaintiffs' claims grounded in conflict preemption.

Commissioner Defendants from implementing the B20 mandate without adhering to the rulemaking requirements set forth in MAPA.  (*Id.*)

All parties have now filed dispositive motions.  Plaintiffs move for partial summary judgment on Counts One and Two, and also seek a declaration that they have standing to challenge the Minnesota Mandate on preemption grounds.  The State Defendants and Defendant-Intervenors separately move for judgment on the pleadings on all claims.  The State Defendants also move the Court to take judicial notice of various exhibits – Plaintiffs do not oppose this motion.[2]

## ANALYSIS

## I.   STANDARDS OF REVIEW

### A.   Judgment on the Pleadings

In reviewing a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), the Court applies the same standard as it would on a motion to dismiss pursuant to Rule 12(b)(6).  *Clemons v. Crawford*, 585 F.3d 1119, 1124 (8th Cir. 2009).  Accordingly, the Court is required to "'accept as true all factual allegations set out in the complaint' and to 'construe the complaint in the light most favorable to the plaintiff[s], drawing all inferences in [the plaintiffs'] favor.'"  *Ashley Cty. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir. 2009) (quoting *Wishnatsky v. Rovner*, 433 F.3d 608, 610 (8th Cir. 2006)).  Although a complaint need not contain "detailed factual allegations," it

---

[2] Because Plaintiffs do not oppose the motion for judicial notice, the Court will grant it.

must contain sufficient factual allegations "to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

## B.    Summary Judgment

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is material if it might affect the outcome of the lawsuit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences to be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "To defeat a motion for summary judgment, a party may not rest upon allegations, but must produce probative evidence sufficient to demonstrate a genuine issue [of material fact] for trial." *Davenport v. Univ. of Ark. Bd. of Trs.*, 553 F .3d 1110, 1113 (8th Cir. 2009) (citing *Anderson*, 477 U.S. at 247-49).

## II.    CONFLICT PREEMPTION CLAIMS (Counts 1 and 3)

### A.    Standing

The Court must first determine whether Plaintiffs have standing to challenge the Minnesota Mandate on the basis of conflict preemption.  Article III, section 2 of the Constitution limits federal courts' jurisdiction to certain "Cases" and "Controversies." U.S. Const. art. III, § 2, cl. 1.  "'One element of the case-or-controversy requirement' is that plaintiffs 'must establish that they have standing to sue.'"  *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1146 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)). Plaintiffs in this action are trade organizations seeking to sue on behalf of their members. An association has standing to sue on behalf of its members if (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000).  In evaluating whether an association's members would have standing to sue in their own right, the Court employs the traditional three-part standing test: "(1) injury in fact, (2) a causal connection between that injury and the challenged conduct, and (3) the likelihood that a favorable decision by the court will redress the alleged injury."  *Young Am. Corp. v. Affiliated Comput. Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir. 2005) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).

Because Plaintiffs are invoking federal jurisdiction, they "bear[] the burden of establishing these elements."  *Lujan*, 504 U.S. at 561.  Additionally, the Court need not

determine that all Plaintiffs have standing.  Since all Plaintiffs raise the same issues, the Court has jurisdiction to consider the merits so long as at least one Plaintiff demonstrates standing to sue.  *See Jones v. Gale*, 470 F.3d 1261, 1265 (8th Cir. 2006) ("'[W]here one plaintiff establishes standing to sue, the standing of other plaintiffs is immaterial' to jurisdiction." (quoting *Nat'l Wildlife Fed'n v. Agric. Stabilization & Conservation Serv.,* 955 F.2d 1199, 1203 (8th Cir.1992))); *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998) ("[I]f one party has standing in an action, a court need not reach the issue of standing of other parties when it makes no difference to the merits of the case."); *see also Duke Power Co. v. Carolina Envtl. Study Group*, 438 U.S. 59, 72 n.16 (1978). Finally, Plaintiffs must establish that at least one of them has standing "for each claim [they] seek[] to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)).

Applying the above law here, the Court finds that AFPM has satisfied its burden of establishing associational standing with respect to its preemption claims against the Director Defendant for the reasons discussed below.  Because AFPM has established such standing, the Court need not consider whether the other four Plaintiffs would also have standing for those claims.  Conversely, the Court finds that none of the Plaintiffs have satisfied their standing burden with respect to their claims against the Commissioner Defendants.

### 1.    Preemption Claims Against Director Defendant

The parties do not appear to dispute that AFPM has satisfied the second and third elements of the associational standing test, and for good reason.  AFPM represents the interests of the refining and petrochemical industries, and this action is germane to that purpose.  Moreover, the naming of individual members as plaintiffs is not required because AFPM seeks only declaratory and injunctive relief.  *See Ark. Med. Soc'y, Inc. v. Reynolds*, 6 F.3d 519, 528 (8th Cir. 1993) (finding that suits in which organizations "seek injunctions, a declaratory judgment, and other prospective relief . . . do not require the participation of individual members").  The real dispute centers on whether AFPM's member organizations would have standing to sue the Director Defendant in their own right.  For the reasons that follow, the Court finds that they would.

First, AFPM has sufficiently established injury in fact.  "An injury in fact requires a 'concrete and particularized' harm that is 'actual or imminent, not conjectural or hypothetical.'"  *Balogh v. Lombardi*, 816 F.3d 536, 541 (8th Cir. 2016) (quoting *Lujan*, 504 U.S. at 560).  Here, AFPM alleges that it has members that are regulated by the RFS **and** the Minnesota Mandate,[3] and that the Minnesota Mandate – by way of the biodiesel content requirement – forces these members to modify their business practices, incur additional costs, and alter their RFS compliance strategies.  (Compl. ¶¶ 22, 33, 47-48,

---

[3] The State Defendants and Defendant-Intervenors attack the fact that AFPM has not specifically identified any member organization that is subject to both the RFS and the Minnesota Mandate.  But at the pleading stage, this fact is inconsequential.  *See Disability Rights Wisc., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 802 (7th Cir. 2008) (noting that the requirements of associational standing "allow[] for the member on whose behalf the suit is filed to remain unnamed by the organization").

50.)  These are concrete and particularized harms.  *See Gray v. City of Valley Park*, 567 F.3d 976, 986 (8th Cir. 2009) (finding that increased economic "cost[s] of compliance" and the "inevitabl[e]" need to "alter current [business] practices to establish a procedure that assures compliance with" the challenged ordinance constitutes an "injury-in-fact").  Additionally, these harms are both actual and imminent – the B10 mandate is currently in effect, and the move to B20 is scheduled to take effect in less than two years.[4]

Second, AFPM has adequately established that these harms are "fairly traceable" to the Director Defendant.  "[W]hen a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendants to possess authority to enforce the complained-of provision."  *Dig. Recognition Network, Inc. v. Hutchinson*, 803 F.3d 952, 957-58 (8th Cir. 2015) (quoting *Bronson v. Swensen*, 500 F.3d 1099, 1110 (10th Cir. 2007)).  Whether a defendant possesses enforcement authority sufficient for standing purposes turns on whether he or she has "'some connection with the enforcement' of [the] state law."  *Id.* at 957 (quoting *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006)).  Here, the Director Defendant indisputably has some connection to the enforcement of the Minnesota Mandate.  The statutory scheme allows the Director Defendant to, among other things, "issue a citation" or "request that a city or county attorney draft a

---

[4] The State Defendants and Defendant-Intervenors argue that AFPM cannot establish actual and/or imminent harm because the alleged injuries are self-inflicted – AFPM's member organizations choose to participate in the Minnesota fuel market.  But the Supreme Court has expressly rejected this "stop-selling" rationale in an impossibility preemption case, *see Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2477 (2013), and the Court will do the same here.

misdemeanor complaint" if a fuel retailer fails to meet the pertinent blending requirement.  Minn. Stat. § 239.75, subd. 2(4)-(5).  And AFPM member organizations' alleged injuries are directly traceable to this enforcement power – members would face the prospect of the Director Defendant's legal action if they failed to comply with the Minnesota Mandate.

Third and finally, AFPM has sufficiently established that declaratory and injunctive relief would redress its member organizations' alleged injuries.  If the Court were to declare that the RFS preempts the Minnesota Mandate and enjoin the Director Defendant from utilizing her enforcement power, this would alleviate the need for AFPM member organizations to modify their business practices, incur additional costs, and alter their RFS compliance strategies.

Because AFPM has satisfied its standing burden with respect to its preemption claims against the Director Defendant, the Court need not examine whether the other Plaintiffs would also have standing.  *See Jones*, 470 F.3d at 1265.[5]

## 2.    Preemption Claims Against Commissioner Defendants

On the other hand, Plaintiffs have failed to establish standing with respect to their preemption claims against the Commissioner Defendants.  Plaintiffs seek injunctive and declaratory relief to prevent the Commissioner Defendants from making the predicate factual findings for the B20 mandate.  As noted above, however, to establish fairly

---

[5] Because the Director Defendant has authority to enforce the Minnesota Mandate, an action for declaratory or injunctive relief against her is not barred by sovereign immunity under the Eleventh Amendment. *See Ex parte Young*, 209 U.S. 123, 155-56 (1908).

traceable causation, Plaintiffs must show that the Commissioner Defendants have "'some connection with the enforcement' of [the] state law." *Dig. Recognition Network*, 803 F.3d at 957 (quoting *Citizens for Equal Prot. v. Bruning*, 455 F.3d 859, 864 (8th Cir. 2006)). Plaintiffs have not, and cannot, make this showing. As the Eighth Circuit has held, authority to "**implement**[ a] statute in an administrative or ministerial sense" does not constitute some connection to enforcement. *Balogh*, 816 F.3d at 546. And here, making statutorily predetermined factual findings is an administrative and ministerial act connected solely to the implementation rather than the enforcement of B20 requirement.

Plaintiffs contend that the Commissioner Defendants do have a viable connection to enforcement because their eventual factual findings will trigger the B20 mandate. Plaintiffs rely primarily on *Missouri Protection and Advocacy Services, Inc. v. Carnahan*, where the Eighth Circuit found, in the context of an Eleventh Amendment analysis, that Missouri's Secretary of State had some connection to the enforcement of a law that disqualified individuals adjudged incompetent from voting, even though the Secretary of State had no specific enforcement power. 499 F.3d 803, 807 (8th Cir. 2007). The court relied in part on the fact that the secretary of state was statutorily responsible for sending local election officials, who did have enforcement power, the names of persons who had been adjudged incompetent. *Id.* Plaintiffs argue that the Commissioner Defendants' authority is analogous to that of the secretary of state from *Carnahan* – both set the standard to be enforced. A more recent Eighth Circuit decision, however, demonstrates that *Carnahan* is distinguishable.

In *Balogh*, the ACLU challenged a Missouri statute that created a private right action against anyone who knowingly disclosed the identity of a current or former member of the state's execution team without prior approval from the Director of the Missouri Department of Corrections.  816 F.3d at 539.  The ACLU argued that this cause of action, as applied to its conduct, violated its rights under the First and Fourteenth Amendments, and it sued the director, seeking injunctive and declaratory relief.  *Id.* at 540.  The Eighth Circuit, however, determined that the ACLU lacked standing, and also that the director was entitled to sovereign immunity, because the director had no connection to the enforcement of the statute.  *Id.* at 543-46.  The court noted that although the director had "authority to delineate the members of the execution team," which would "affect who might have a private right of action," that authority had "nothing to do with an execution team member's potential prosecution of such an action." *Id.* at 546.  The court then distinguished the director's authority from that of the secretary of state in *Carnahan*.  The court noted that in *Carnahan*, "[t]he secretary of state was connected to enforcing voter eligibility requirements because Missouri law obligated her 'to send local election authorities the names of persons who are adjudged incapacitated' and that action may have been why the plaintiff was erroneously prohibited from voting." *Id.*  The director's selection of execution team members, by contrast, "constitute[d] implementation of the statute in an administrative or ministerial sense," and was "not analogous to enforcing the statute's non-disclosure provision."  *Id.*

Here, the Commissioner Defendants' authority is akin to that of the director from *Balogh*, and not the secretary of state from *Carnahan*.  While the Commissioner

Defendants' eventual factual findings will affect what constitutes a violation of the Minnesota Mandate, their authority to make those factual findings has nothing to do with whether any particular fuel retailer will comply with the B20 mandate or whether the Director Defendant will actually exercise her enforcement authority. Simply put, the Commissioner Defendants' ability to implement the B20 mandate does not constitute some connection to enforcement. And absent some connection to enforcement, Plaintiffs cannot show fairly traceable causation and thus lack standing to pursue their preemption claims against the Commissioner Defendants.

### B.    Cause of Action

The parties next dispute whether AFPM has a viable cause of action against the Director Defendant. *See Davis v. Passman*, 442 U.S. 228, 239 n.18 (1979) (noting that a plaintiff must have a cause of action to "invoke the power of the court"). AFPM concedes that the CAA provides neither an express nor implied right of action that would allow it to enforce the RFS, and instead argues that it may proceed in equity. The Supreme Court has long recognized that a plaintiff may invoke the equitable powers of the federal courts in order to seek "relief against state officers who are violating, or planning to violate, federal law," including on the basis of preemption under the Supremacy Clause. *Armstrong*, *v. Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (noting that a court's equitable power allows a plaintiff to sue to "enjoin state officials from interfering with federal rights"). However, the availability of this equitable cause of action "is subject to express and implied statutory limitations." *Armstrong*, 135 S. Ct. at 1385.

Because "[t]he ability to sue to enjoin unconstitutional actions by state . . . officers . . . is a judge-made remedy," Congress may abrogate the remedy. *Id.* at 1384-85. Thus, whether AFPM may proceed in equity against the Director Defendant depends on whether Congress "inten[ded] to foreclose equitable relief" for violations of the RFS. *Id.*

Defendants argue that Congress impliedly intended to preclude equitable enforcement of the RFS because it created only one cause of action for violations – the ability to sue to seek an injunction – and mandated that such an action "shall be brought by and in the name of the United States." 42 U.S.C. § 7545(d)(2). The Court, however, is not convinced. While Defendants are correct that the "express provision of one method of enforc[ement] . . . suggests that Congress intended to preclude others," the Supreme Court has noted that this factor, "**by itself**," is not necessarily dispositive. *Armstrong*, 135 S. Ct. at 1385. And here, several other factors lead the Court to conclude that Congress did not impliedly intend to foreclose equitable enforcement of the RFS. *See Weinberger v. Romero-Barcelo*, 456 U.S. 305, 313 (1982) (noting that equitable relief must not "be denied or limited" unless there is a "necessary and inescapable inference" of such intent by Congress).

First, and most significantly, nothing about the RFS program is "judicially unadministerable." *Armstrong*, 135 S. Ct. at 1385 (finding that Congress intended to foreclose equitable enforcement of § 30(A) of the Medicaid Act in part because of the complexity and "judicially unadministerable" nature of the provision). Indeed, if this Court is capable of deciding an action for injunctive relief on the basis of conflict preemption brought "by and in the name of the United States" under § 7545(d)(2), it is

certainly capable of deciding a comparable equitable action brought by a private party. Second, although Congress created express rights of action for private parties under the CAA, and the right to enforce the RFS was not among them, the statute explicitly provides that these enumerated private rights of action "shall [not] restrict any right which any person (or class of persons) may have under any statute or common law . . . to seek any other relief."  42 U.S.C. § 7604(e).  This provision bolsters the conclusion that Congress intended to preserve, rather than eliminate, the equitable power of federal courts to decide preemption claims involving the RFS credit program.  Third and finally, there is nothing else within statute, aside from § 7545(d)(2), suggesting that Congress meant to foreclose equitable relief.  This is significant in light of the Supreme Court's pronouncement that

> equitable jurisdiction is not to be denied or limited in the absence of a clear and valid legislative command.  Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied. The great principles of equity, securing complete justice, should not be yielded to light inferences, or doubtful construction.

*Romero-Barcelo*, 456 U.S. at 313 (citation and internal quotation marks omitted) (quoting *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946)).  The Court therefore rejects Defendants' argument – Congress did not impliedly intend to bar equitable enforcement of the RFS, and AFPM may proceed in equity against the Director Defendant.


### C.    Conflict Preemption

Having reached the merits, the Court must finally determine whether the Minnesota Mandate actually conflicts with, and is thus preempted by, the RFS.

- 21 -

"The general law of preemption is grounded in the Constitution's command that federal law 'shall be the supreme Law of the Land.'" *In re Aurora Dairy Corp. Organic Milk Mktg. & Sales Practices Litig.*, 621 F.3d 781, 791 (8th Cir. 2010) (quoting U.S. Const. art. VI, cl. 2).  In practice, this means that when a state law conflicts with federal law, the state law has no effect.  *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981). "Whether a particular federal statute preempts state law depends upon congressional purpose." *In re Aurora Dairy*, 621 F.3d at 791 (citing *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485-86 (1996)).  "Preemptive intent may be indicated 'through a statute's express language or through its structure and purpose.'" *Id.* at 792 (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).

Here, AFPM argues that the Minnesota Mandate is preempted by the RFS on the basis of conflict preemption.  Conflict preemption exists "when the state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Hillman v. Maretta*, 133 S. Ct. 1943, 1950 (2013) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).  Conflict preemption can arise even where the state and federal law share a common "ultimate goal" if the state law "interferes with the methods by which the federal statute was designed to reach this goal." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

In arguing that the Minnesota Mandate is preempted, AFPM first contends that Congress, by enacting the RFS, intended to create a flexible market-based credit system in which obligated parties would have "unfettered discretion as to where and when to blend biofuels and in what proportion."  (Pls.' Mem. Of Law in Supp. of Mot. for Partial

Summ. J. ("Pls.' Supp. Mem.") at 21, Nov. 9, 2015, Docket No. 47.)   According to

AFPM, the Minnesota Mandate stands as an obstacle to the execution of this unfettered

market-based mechanism and frustrates the means that Congress selected to implement

the RFS, because the state law imposes "content, geographic and timing restrictions on

the blending of biodiesel that restrict obligated parties' discretion to determine how,

where, and when best to blend biodiesel into petroleum diesel." (*Id.*)   AFPM cites three

specific examples.

First, AFPM notes that the RFS affirmatively prevents EPA from imposing any

per-gallon blending requirement.   *See* 42 U.S.C. § 7545(o)(2)(A)(iii)(II)(bb) ("[T]he

regulations . . . shall not . . . impose any per-gallon obligation for the use of renewable

fuel.")   The purpose of this prohibition, according to AFPM, is to allow obligated parties

to make blending decisions based on a "range of market factors, such as price, local

availability, and potential impact on vehicles and engines." (Pls.' Supp. Mem. at 21.)

AFPM argues that the Minnesota Mandate thwarts this purpose by requiring every gallon

of diesel fuel sold by fuel retailers within Minnesota to contain a specific percentage of

biodiesel, regardless of the availing market factors.   *See* Minn. Stat. § 239.77, subd. 2(a).

Second, AFPM points out that the RFS prohibits EPA from imposing any

geographic limitations on the blending of biomass-based diesel.   *See* 42 U.S.C.

§ 7545(o)(2)(A)(iii)(II)(aa) ("[T]he regulations . . . shall not . . . restrict geographic areas

in which renewable fuel may be used.").   According to AFPM, this prohibition gives fuel

retailers and suppliers freedom "to select the locations in which to blend biomass-based

diesel based on non-regulatory factors, such as price, availability, and available

infrastructure."  (Pls.' Supp. Mem. at 22.)   AFPM argues that the Minnesota Mandate frustrates this objective because it imposes a biodiesel blending requirement for all diesel fuel sold within the geographic boundaries of the state.   *See* Minn. Stat. § 239.77, subd. 2(a).

Third, AFPM notes that "the RFS does not impose any time constraints during any given year as to when biomass-based diesel must be blended into the diesel fuel supply." (Pls.' Supp. Mem. at 23.)  The Minnesota Mandate, by comparison, requires biodiesel to be blended into the diesel fuel supply according to a fixed schedule – currently, diesel fuel must contain at least ten percent biodiesel "during the months of April, May, June, July, August, and September," and five percent in all other months.  Minn. Stat. § 239.77, subd. 2(a).  AFPM argues that "[t]hese timing-specific requirements interfere with the RFS because they do not allow for the blending flexibility that is a fundamental component of the RFS."  (Pls.' Supp. Mem. at 23.)

In addition to impeding blending flexibility, AFPM also argues that Minnesota Mandate frustrates Congress's intent to "diversify[] the nation's energy portfolio."  (*Id.* at 22.)   AFPM contends that the RFS scheme covers "biomass-based diesel," which includes both the type of biodiesel regulated by the Minnesota Mandate as well as non-ester renewable diesel, which is not regulated by the Minnesota Mandate.  AFPM argues that because the Minnesota Mandate more narrowly defines what constitutes biodiesel, the statute effectively disfavors non-ester renewable diesel and thus stands as an obstacle to achievement of renewable fuel diversification.

The Court, however, is not persuaded by any of AFPM's arguments and instead reaches a contrary conclusion – the Minnesota Mandate does not conflict with the RFS, and the RFS therefore does not preempt the Minnesota Mandate.

First, the Court finds no support for AFPM's argument that Congress's intent in creating the RFS was to establish a market-based credit system in which obligated parties would have **unfettered** discretion and **maximum** compliance flexibility with respect to blending, free from any and all state regulation.  When Congress amended the CAA in 2007 and created the present version of the RFS, it noted that its goals were

> [t]o move the United States toward greater energy independence and security, to increase the production of clean renewable fuels, to protect consumers, to increase the efficiency of products, buildings, and vehicles, to promote research on and deploy greenhouse gas capture and storage options, and to improve the energy performance of the Federal Government, and for other purposes.

Energy Independence and Security Act of 2007, Pub. L. No. 110-140, 121 Stat. 1492 (prefatory statement).  Missing from this prefatory statement is any indication that Congress intended for obligated parties to have undisturbed compliance flexibility, as AFPM argues.

The text of the statute is similarly silent on this issue, and certain provisions actually suggest that Congress did not intend for obligated parties to have unfettered compliance discretion.  Section 7545(o)(5)(C), for example, provides that credits "shall be valid to show compliance" for only 12 months.  Section 7545(o)(5)(D), meanwhile, provides that an obligated party that fails to show compliance in a given year may only "carry forward a renewable fuel deficit" for one year, and in that next year, it must "achieve[] compliance with the renewable fuel requirement" and "generate[] or

purchase[] additional renewable fuel credits to offset the renewable fuel deficit of the previous year."   These provisions are limitations on obligated parties' compliance discretion, which belies AFPM's free-market argument.   Moreover, the two statutory sections that AFPM relies upon – § 7545(o)(2)(A)(iii)(II)(bb), which prohibits the imposition of a per-gallon biodiesel obligation, and § 7545(o)(2)(A)(iii)(II)(aa), which prohibits the imposition of geographical restrictions – apply **only** to EPA.   If Congress intended to limit a **state's** ability to impose per-gallon mandates or geographical restrictions, it could have done so.   That Congress instead decided to impose these limits solely on EPA undermines a basic premise of AFPM's preemption argument.

Also significant is the fact that Congress was aware of the Minnesota Mandate when it enacted the RFS.   The initial version of the Minnesota Mandate was passed in 2002, while the RFS was enacted and amended in 2005 and 2007, respectively.   Around the time that Congress was considering the 2007 amendment, EPA produced a report for Congress in which it addressed state mandates such as Minnesota's.   EPA noted that state mandates "could have an effect of limiting" the flexibility of the RFS credit trading program, but that "[a]dditional analysis" was necessary before any final conclusions could be drawn.   (Aff. of Ann E. Cohen, Ex. 1 at 18, Nov. 30, 2015, Docket No. 65.)   In spite of this report, however, Congress took no corresponding action.   Had Congress intended for the RFS credit system to give obligated parties unfettered compliance discretion with respect to blending, it follows that Congress would have commissioned EPA to conduct the additional recommended analysis; expressly prohibited states from imposing per-gallon blending requirements; or included in the statute an express

preemption clause allowing EPA to preempt any state laws that interfered with the credit program, as it did in a separate section of the statute with respect to state laws enacted "for purposes of motor vehicle emission control." 42 U.S.C. § 7545(c)(4)(A). The fact that Congress did not do any of these things is strong evidence that (1) it did not intend for the credit program to give obligated parties maximum compliance flexibility with respect to blending, free from any state regulation, and (2) it did not intend for the RFS to preempt the Minnesota Mandate. And this is relevant because congressional intent "is the ultimate touchstone in every pre-emption case." *Medtronic*, 518 U.S. at 485-86 (internal quotation mark omitted) (quoting *Retail Clerks v. Schermerhorn*, 375 U.S. 96, 103 (1963)). Consequently, the simple fact that the Minnesota Mandate **may** affect an obligated parties' compliance discretion for blending is not grounds, on its own, to support a finding that the RFS preempts the Minnesota Mandate.

The Court also rejects AFPM's broader argument that the Minnesota Mandate frustrates the free-market means that Congress selected to implement the RFS. The Supreme Court has held that a state law may be preempted if it stands "'as an obstacle to the accomplishment and execution of' the important means-related federal objectives." *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000) (quoting *Hines*, 312 U.S. at 67). Here, the Court does not question that Congress, as a means to promote the production and use of biodiesel, opted to utilize a market-based credit program. The Court also does not question that Congress, in selecting a market-based system, intended for obligated parties to have some discretion to make compliance decisions based on market factors (although not unfettered discretion, for the reasons explained above).

Thus, the Court could certainly envision a hypothetical state statutory scheme that unduly interfered with the RFS and was therefore preempted.  The Minnesota Mandate, however, is not such a scheme.

First, the RFS and the Minnesota Mandate regulate entirely different entities.  *See United of Omaha v. Bus. Men's Assurance Co. of Am.*, 104 F.3d 1034, 1041 (8th Cir. 1997) (finding that a state law did not conflict with ERISA in part because the laws regulated different parties).  The RFS only applies to fuel producers, refiners, and importers, whereas the Minnesota Mandate applies to fuel retailers.  *Compare* 42 U.S.C. § 7545(o)(2)(A)(i), *and* 40 C.F.R. § 80.1406(a)(1), *with* Minn. Stat. § 239.77, subd. 2(a). Thus, irrespective of the Minnesota Mandate, RFS obligated parties remain free to acquire RINs and show compliance in all of the manners permitted by EPA's regulations. Moreover, the Minnesota Mandate does not actually impose any blending requirements on RFS obligated parties, as AFPM argues.  The Minnesota Mandate simply requires that diesel fuel, at the time of sale at retail, contain a certain percentage of biodiesel – the state law says nothing about when or where blending must take place.  RFS obligated parties who chose to participate in the Minnesota market therefore have no mandatory blending obligation.  An obligated party could blend and sell B5 or B10 to a Minnesota fuel retailer, **or** it could sell unblended diesel and/or biodiesel and allow the fuel retailer to splash blend in its own tank.  Accordingly, the Minnesota Mandate does not directly alter an obligated party's ability to comply with EPA's regulations, or directly impose any content, geographical, or timing limitations with respect to blending.

AFPM argues that even if the Minnesota Mandate does not directly regulate obligated parties, its indirect effects frustrate the market-based mechanism envisioned by Congress.  But as the Supreme Court has recognized, "Congressional regulation of one end of the stream of commerce does not, ipso facto, oust all state regulation at the other end."  *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 145 (1963).  And a close examination of the Minnesota Mandate reveals that it actually compliments the credit program.  Section 7545(o)(5)(A)(i) directs EPA to promulgate regulations that provide "for the generation of an appropriate amount of credits by any person that refines, blends, or imports gasoline that contains a quantity of renewable fuel that is **greater** than the quantity required."  This provision evidences Congress's intent for the credit program to reward obligated parties that exceed their minimum biodiesel requirement, presumably to promote the production and use of biodiesel.  The Minnesota Mandate directly supports this goal because it creates a market for biodiesel.  Indeed, by requiring all gallons of diesel fuel sold at retail to contain a minimum percentage of biodiesel, the Minnesota Mandate generates demand for biodiesel and incentivizes RFS obligated parties to produce, acquire, or blend biodiesel, which in turn generates more RINs.  EPA has recognized this benefit, noting in 2013 that state mandates such as Minnesota's would "help the nation to meet" its biodiesel requirement for that year. Regulation of Fuels and Fuel Additives: 2013 Biomass-Based Diesel Renewable Fuel Volume, 77 Fed. Reg. 59,458, 59,467 (Sept. 27, 2012); *cf.* Regulation of Fuels and Fuel Additives: Renewable Fuel Standard Program, 72 Fed. Reg. 23,900, 23,953-54 (May 1, 2007) (noting that "state ethanol mandates" have helped "drive up demand for ethanol"

and put "the nation . . . on track to exceed the renewable fuel volume requirements contained in the [RFS]").

AFPM argues that EPA's recent decision to reduce the yearly minimum volume for biodiesel[6] proves that the Minnesota Mandate has no impact on the market for biodiesel. But the Court is not persuaded. If EPA – the agency charged with implementing, administering, and enforcing the RFS – believed that the Minnesota Mandate conflicted with the credit program or undermined Congress's renewable fuel objectives, it could bring an action under 42 U.S.C. § 7545(d)(2) for injunctive relief on preemption grounds. That EPA has not done this is but one more piece of evidence supporting the conclusion that the Minnesota Mandate does not frustrate the means that Congress selected to implement the RFS. *See Geier*, 529 U.S. at 883-84 (finding that a court may give weight to an implementing agency's interpretation of a statute).

As a final matter, the Court recognizes that there is some degree of tension between the Minnesota Mandate and the RFS. It is true, for example, that one of Congress's goals in enacting the RFS was to promote the diversification of the nation's renewable fuel supply, and the Minnesota Mandate promotes only one type of renewable fuel – biodiesel. It is also true that the Minnesota Mandate could indirectly impact or alter how obligated parties go about complying with the RFS. But mere "tension" is insufficient to establish conflict preemption where the state law does not actually "frustrate the objectives of the federal law." *See Silkwood v. Kerr-McGee Corp.*, 464

---

[6] *See* Renewable Fuel Standard Program: Standards for 2014, 2015, and 2016 and Biomass-Based Diesel Volume for 2017, 80 Fed. Reg. 77,420 (Dec. 14, 2015).

U.S. 238, 256 (1984). And here, there is no such frustration: neither the legislative history nor the statutory scheme suggest that Congress intended for obligated parties to have unfettered blending flexibility; Congress knew about the Minnesota Mandate when it created the current version of the RFS; the Minnesota Mandate regulates entirely different entities than the RFS and does not directly limit an obligated party's compliance options; the Minnesota Mandate actually compliments the RFS by creating a market on the demand side for biodiesel; and there is no evidence that EPA disfavors state mandates such as Minnesota's. The Court thus finds that the Minnesota Mandate is not preempted by the RFS.

Because there is no unconstitutional conflict, the Court will grant the State Defendants' and Defendant-Intervenors' motions for judgment on the pleadings with respect to Counts One and Three, to the extent those counts seek declaratory and injunctive relief on the basis of conflict preemption. The Court will also deny Plaintiffs' corresponding motion for partial summary judgment.

## III.   MAPA CLAIMS (Counts 2 and 3)

In Counts 2 and 3, Plaintiffs alternatively seek to prevent or delay the enforcement and implementation of the Minnesota Mandate by arguing that the Commissioner Defendants violated or will violate various rulemaking procedures contained in MAPA. But the Court need not reach the merits of these claims because the State Defendants are immune from the lawsuit under the Eleventh Amendment. "The Eleventh Amendment bars federal court jurisdiction over state law claims against unconsenting states or state officials when the state is the real, substantial party in interest." *Cooper v. St. Cloud*

*State Univ.*, 226 F.3d 964, 968 (8th Cir. 2000) (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89 (1984)).  This constitutional prohibition applies "regardless of the remedy sought" and "with equal force to pendent state law claims," unless the state waives its immunity.  *Id.* 968-69 (citing *Pennhurst*, 465 U.S. at 120-21).  Here, Plaintiffs seek declaratory and injunctive relief against the State Defendants, state officials, based on purported and prospective state law violations, and the State of Minnesota is the real, substantial party in interest. Minnesota has not waived immunity.   Thus, Plaintiffs' MAPA claims are barred by the Eleventh Amendment.

Plaintiffs do not raise any substantive counterarguments and instead contend that Defendants waived their Eleventh Amendment defense because they responded to requests for admission concerning the MAPA claims.  Plaintiffs rely on *Ku v. Tennessee*, 322 F.3d 431 (6th Cir. 2003), but that reliance is unavailing.  In *Ku*, the Sixth Circuit found that Tennessee waived its Eleventh Amendment defense because it "appear[ed] without objection," "engaged in extensive discovery," defended the case "on the merits," "invited the district court to enter judgment on the merits," and only raised the Eleventh Amendment defense "after a final adverse ruling."   *Id.* at 432-435.  Here, by contrast, Defendants raised the Eleventh Amendment defense in their Answer, Statement of the Case, Rule 26(f) report, and Rule 12(c) motion, all before the Court made any rulings on the merits, let alone a final adverse ruling.  Additionally, there is no indication that Defendants appeared without objection to the Court's jurisdiction or that the parties engaged in "extensive" discovery.  And answering a request for admission does not

constitute waiver, particularly where Defendants have raised the Eleventh Amendment defense at all relevant stages of the case.

The Court will therefore grant the State Defendants' and Defendant-Intervenors' motions for judgment on the pleadings with respect to Counts Two and Three, to the extent those counts seek declaratory and injunctive relief on the basis of MAPA violations. And the Court will deny Plaintiffs' motion for partial summary judgment on those same counts.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1. The State Defendants' motion for judicial notice [Docket No. 52] is **GRANTED**.

2. Plaintiffs' motion for partial summary judgment [Docket No. 45] is **DENIED**.

3. The State Defendants' motion for judgment on the pleadings [Docket No. 50] is **GRANTED**.

4. Defendant-Intervenors' motion for judgment on the pleadings [Docket No. 54] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED:  September 29, 2016                          s/ John R. Tunheim
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                    Chief Judge
                                                    United States District Court